CLEMENTE GLOBAL GROWTH
FUND, INC., Plaintiff,

v.

T. Boone PICKENS, III, Oliver R. Grace, Jr., John S. Grace, Grace–Pickens Acquisition Corp., Sumter Partners, L.P., Grace–Merrill, L.P., Drake Associates L.P., Anglo–American Security Fund, L.P., Sterling Grace Capital Management, L.P. and Churchill Associates, L.P., Defendants.

No. 88 Civ. 5317 (JFK).

United States District Court,
S.D. New York.

Jan. 31, 1989.

As Amended Feb. 3, 1989.

Gaston & Snow, New York City (Charles M. Mattingly and Donald N. Cohen, of counsel), for plaintiff.

Olshan, Grundman & Frome, New York City (Elyse S. Goldweber, Jeffrey N. Bernstein and Jeffrey M. Schwartz, of counsel), for defendants.

## OPINION AND ORDER

KEENAN, District Judge:

### BACKGROUND

Plaintiff, Clemente Global Growth Fund, Inc. (the "Fund"), has filed a second amended complaint alleging that the defendants and their tender offer vehicle, Grace Pickens Global Acquisition Partners ("GPGAP"), have violated sections 13(d) and 14(e) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78m(d), 78n(e) by launching "an illegal, inherently coercive and deceptive tender offer for Fund stock." Second Amended Compl., ¶ 1. Plaintiff seeks a preliminary injunction enjoining defendants from closing their tender offer for up to 100% of the shares of the Fund. For the reasons set forth below, plaintiff's application is granted.

### FACTS

Plaintiff is a diversified, closed-end management[1] investment company formed in 1987 for the purpose of long-term capital appreciation through investment in equity securities of small and medium sized companies. There are approximately 5,914,100 shares of plaintiff's stock outstanding. Plaintiff is registered under the Investment

---

1. See 15 U.S.C. § 80a–5(a). Closed-end management companies typically have a fixed number of outstanding shares which are traded on the exchanges at a price determined by the market.

Company Act of 1940 (the "1940 Act") and its shares are traded on the New York Stock Exchange ("NYSE").

The defendants formed GPGAP, a general partnership comprised of the six limited partnership defendants, in late 1988 for the purpose of launching a tender offer for the Fund's shares. Defendants T. Boone Pickens, III, John S. Grace and Oliver R. Grace, Jr. are the sole shareholders of GPGAP.

The six limited partnership defendants may be broken down into three groups. Sumter Partners, L.P. is a limited partnership allegedly controlled by T. Boone Pickens, III. Grace–Merrill, L.P., Drake Associates, L.P., Anglo–American Security Fund, L.P., and Sterling Grace Capital Management, L.P. are purportedly controlled by members of the Grace family. Churchill Associates, L.P. is allegedly controlled by the Pinto family.

Defendants have accumulated 1,119,600 shares of the Fund, comprising just under 19% of the Fund's outstanding shares. Defendants crossed the 5% threshhold required for Schedule 13D filing purposes on June 30, 1988 and the bulk of their purchases were made during the seven weeks ending August 19, 1988. Briefly, a Schedule 13D filing, disclosing certain specified information, is required under § 13(d) of the Exchange Act whenever an entity acquires at least 5% of a corporation's outstanding stock.

Plaintiff maintains that defendants' filings pursuant to § 13(d) have been late, and, when filed, have been deficient. In particular, plaintiff pleads that none of defendants' filings with the SEC have stated defendants' "true group purpose, which upon information and belief, is and has been (since before July 15), to control the Fund and to radically change the Fund's investment objective and policies." Second Amended Compl., ¶ 55. Other deficiencies alleged in defendants' filings are inadequate descriptions of who controls the defendants, their prior attempts to gain control of other entities, whether the defendants are actually acting as a group and the manner in which the shares of stock were purchased.

### A. The Tender Offer and the SEC Investigation

On December 13, 1988, the Securities and Exchange Commission ("SEC"), pursuant to an ongoing investigation into defendants' investment activities, issued an "Order Directing Private Investigation and Designating Officers to Take Testimony" concerning defendants' investment activities. *See* Affidavit of Charles M. Mattingly ("Mattingly Aff."), Exh. A. In the order, the SEC Division of Enforcement presented information that, in the Commissioners' judgment, "tends to show" (a) that defendants may have violated § 13(d) of the Exchange Act by filing late, incomplete and incorrect Schedule 13D disclosures and amendments and by not disclosing their plans or proposals relating to a change in the Fund's investment purpose or objective; (b) that defendants may have acted as an investment company with respect to the Fund without being registered as an investment company under the 1940 Act; and (c) that defendants may have acquired more than 3% of the Fund's stock as an investment company in violation of § 12(d)(1)(A) of the 1940 Act. *See id.*

Despite the pendency of this investigation, on January 3, 1989 GPGAP delivered a Schedule 14D–1 to the Fund, commencing a tender offer for a minimum of a majority of Fund stock (when added to the limited partnership defendants' prior holdings), and up to 100% of the outstanding stock. Although GPGAP's Schedule 14D–1 does not contain a copy of the SEC order authorizing a formal investigation, it does note that the order has been issued and cursorily recites the alleged violations and their possible consequences for the violators. The Schedule 14D–1 does not provide the factual circumstances from which the SEC reached the preliminary conclusion that defendants may have acted as an unregistered investment company within the meaning of the Exchange Act. Plaintiff contends that the omission of these facts renders the Schedule 14D–1 materially misleading because that information would be material to any Fund shareholder considering whether to tender stock to GPGAP.

Plaintiff further argues that the Schedule 14D-1 is deficient in other respects. In brief, plaintiff takes the position that defendants declined to apprise Fund shareholders of the significant possibility that defendants will be barred from management of the Fund because of SEC violations, failed to disclose a summary of each loan agreement or arrangement and the plans of GPGAP, the actual tender offeror, to repay $23.3 million in borrowings incurred to finance the $38 million tender offer, as required by Item 4 of the Special Instructions For Complying With Schedule 14D-1, and failed to disclose sufficient information about GPGAP and its partners, as required by Item 9 of the Special 14D-1 Instructions. *See* Second Amended Compl., ¶¶ 48, 50; Mattingly Aff., ¶¶ 55–59.

Plaintiff asserts that the instant tender offer requires Fund shareholders to make a choice based on the Schedule 14D-1 without knowing whether defendants can lawfully acquire more Fund stock, or whether the SEC will preclude defendants from accomplishing what they intend by turning them into passive, nonmanaging investors as a result of Exchange Act violations. Plaintiff points out that if defendants are determined to be an investment company, § 12(d)(1)(A) of the 1940 Act would prohibit defendants from owning more than 3% of another investment company's stock. Similarly, if § 13(d) violations are established, plaintiffs contend that defendants or any affiliated party would be precluded from investment company management. Plaintiffs fear that if defendants' tender offer is consummated, defendants will effect radical changes upon the Fund's investment policies, changes which would be irreversible if SEC sanctions were later to vitiate defendants' management of the Fund. Thus, plaintiff seeks a preliminary injunction preventing defendants from closing their tender offer for up to 100% of Fund's shares on February 1, 1989.

## DISCUSSION

Before addressing the merits of plaintiff's application for a preliminary injunction, it is first necessary to determine whether plaintiff has standing to come before this Court and invoke its injunctive powers. Defendants urge that plaintiff lacks standing to sue to enforce § 12(d)(1) of the 1940 Act, principally relying on *SEC v. General Time Corp.*, 407 F.2d 65 (2d Cir.1968), *cert. denied*, 393 U.S. 1026, 89 S.Ct. 637, 21 L.Ed.2d 570 (1969). That case, however, is inapposite here.

*General Time* involved a lawsuit by the SEC against Talley Industries and American Investors Fund for violations of § 17(d) of the 1940 Act. Section 17(d) prohibits an affiliated person of a registered investment company from effecting any transaction in which such registered company is a joint participant at the expense of the registered company. General Time, a nominal defendant in the action, sought to appeal the district court's decision for providing an insufficient remedy. The SEC did not appeal. *See id.* at 68–69.

After noting that the Second Circuit was the first court of appeals to recognize private rights of action under the 1940 Act, the Second Circuit, speaking through Judge Friendly, held that General Time lacked standing to appeal because it was not included in the group of persons Congress intended to protect by passing § 17(d):

> Congress necessarily assumed that the court's jurisdiction would be invoked by someone showing an injury of the sort the [1940] Act meant to prevent, and [General Time] has not done this.

*Id.* at 71. The Court noted that "§ 17(d) does not aim to prevent an affiliate and an investment company from jointly acquiring control of another company *simpliciter;* it seeks only to prevent their doing this on a basis wherein the investment company fares worse than the affiliate." *Id.*

The instant matter is readily distinguishable from *General Time* in that plaintiff's case is brought pursuant to § 12(d)(1)(A) of the 1940 Act, the so-called "antipyramiding provision." That section prohibits one investment company from acquiring more than three percent of the shares of another investment company. By passage of § 12(d)(1)(A), Congress intended to protect investment companies and their sharehold-

ers who are threatened with greater than three percent acquisition by another investment company. Thus, § 12(d)(1)(A) serves to protect the target company and its shareholders—unlike § 17(d), which functions to protect the acquirers' shareholders or limited partners. It follows, then, that *General Time's* rationale is not applicable here.

The Court's research reveals only one case addressing whether a private right of action exists under § 12(d)(1)(A). *See Bancroft Convertible Fund, Inc. v. Zico Investment Holdings Inc.*, 825 F.2d 731 (3d Cir.1987). In *Bancroft*, as in the instant lawsuit, the target investment company sought to enjoin a tender offer by an allegedly unregistered investment company for more than three percent of the shares of the target investment company under § 12(d)(1)(A). Relying principally on the reasoning in another opinion by Judge Friendly (*Fogel v. Chestnutt*, 668 F.2d 100 (2d Cir.1981), *cert. denied*, 459 U.S. 828, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982)), the Third Circuit concluded that a private right of action exists under § 12(d)(1)(A):

> [the acquiring company] makes no persuasive argument ... which suggests congressional intention to treat the prohibition against investment company pyramiding differently, for purposes of private enforcement, than are the various other prohibitions in the Act which are also intended to protect investors.

*Bancroft*, 825 F.2d at 733.

Next, the *Bancroft* court rejected the acquiring company's argument (and the argument defendants assert here) that, even if there is a private right of action under § 12(d)(1)(A), "management [of the target investment company] should not have standing to assert it in a tender offer situation":

> [T]his argument ... ignores the realities of tender offer litigation which demonstrate that such a standing rule would be toothless.... More fundamentally, however, we note that *section 10 of the Investment Company Act ... indicates that [the] directors [of investment companies] are uniquely qualified to assert*

*private causes of action in the interest of the security holders to whom they owe fiduciary obligations.*

*Id.* at 733 (emphasis added).

This Court is persuaded by the well-reasoned opinion of the *Bancroft* Court. If target investment companies, such as the Fund, were unable to enforce § 12(d)(1)(A), that provision would rarely, if ever be enforced. Plaintiff has standing to pursue a private right of action under § 12(d)(1)(A) against defendants.

### GPGAP and the Six Limited Partnership Defendants' Status as Investment Companies

As previously observed, § 12(d)(1)(A) prohibits an investment company from purchasing more than 3% of the outstanding voting stock of another investment company. This so-called "antipyramiding" provision implements the declaration in the 1940 Act that "the national public interest and the interest of investors are adversely affected" (i) when investment companies, such as the Fund, are managed "in the interest of other investment companies ... rather than in the interest of all classes of such companies' securities holders," (ii) when "control of investment companies is unduly concentrated through pyramiding or inequitable methods of control" or (iii) when investment companies "change the character of their business, or when the control or management thereof is transferred, without the consent of their security holders." 15 U.S.C. § 80a–1(b)(2), (4) and (6).

It is undisputed that the Fund is an investment company. Defendants currently own approximately 19% of the Fund's outstanding voting stock and contemplate acquiring up to 100%. Thus if the six limited partnership defendants and GPGAP are investment companies, and none of the statutory exemptions are available to them, their prior acquisition of greater than 3% of the Fund's stock and the contemplated tender offer would be illegal.

Section 3(a) of the 1940 Act defines "investment company" as "any issuer which—(1) is or holds itself out as being engaged

primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities...." Section 2(a)(8) defines "company" as "a corporation, a partnership, an association, a joint-stock company, a trust, a fund, or any organized group of persons whether incorporated or not." "Person" is defined as "a natural person or a company." 15 U.S.C. § 80a–2(a)(28).

■ ] The six limited partnership defendants were "formed to invest in marketable securities generally or in the case of Sumter, to invest in securities of closed-end investment companies such as the [Fund]." *See* Schedule 13D, Item 4 (annexed to original complaint). GPGAP was formed to facilitate the making of the tender offer for Fund shares. *See* Schedule 14D-1, Mattingly Aff., Exh. B. It is evident that the six limited partnership defendants and GPGAP are investment companies within the meaning of the 1940 Act. Unless these entities fall within one of the statutory exemptions enumerated in the remaining subsections of § 3, the contemplated tender offer is illegal.

■ Defendants contend that GPGAP and the six limited partnership defendants may avail themselves of the exemption provided for in § 3(c)(1) of the 1940 Act:

"Notwithstanding subsection (a) of this section, none of the following persons is an investment company within the meaning of this subchapter:

(1) Any issuer whose outstanding securities (other than short-term paper) are beneficially owed by not more than one hundred persons and which is not making and does not presently propose to make a public offering of its securities. For purposes of this paragraph:

(A) Beneficial ownership by a company shall be deemed to be beneficial ownership by one person, except that, if the company owns 10 per centum or more of the outstanding voting securities of the issuer, the beneficial ownership shall be deemed to be that of the holders of such company's outstanding securities (other than short-term paper) unless, as of the date of the most recent acquisition by such company of securities of that issuer, the value of all securities owned by such company of all issuers which are or would, but for the exception set forth in this subparagraph, be excluded from the definition of investment company solely by this paragraph, does not exceed 10 per centum of the value of the company's total assets. Such issuer nonetheless is deemed to be an investment company for purposes of section 80a–12(d)(1) of this title."

15 U.S.C. § 80a–3(c)(1)(A). Plaintiff urges this Court to construe the last sentence of § 3(c)(1)(A) as disclaiming the "one hundred persons" exemption's availability as a defense in claims brought under § 12(d)(1)(A). This interpretation runs afoul of common sense statutory construction. This Court reads the last sentence of § 3(c)(1)(A) as limited to that portion of subparagraph (A) commencing with the words "unless, as of the date...." The "one hundred persons" exemption is available in claims brought under § 12(d)(1)(A). *Cf. Bancroft Convertible Fund, Inc. v. Zico Investment Holdings Inc.*, 825 F.2d 731 (3d Cir.1987) (implicitly rejecting plaintiff's construction of § 3(c)(1)(A) by engaging in lengthy analysis of affiliated corporate entities in claims brought under § 12(d)(1)(A)).

The six limited partnerships and GPGAP maintain that they are exempt from the 1940 Act's strictures because they have, individually and as a group, fewer than 100 beneficial owners. Plaintiff vigorously contests this assertion, claiming that the defendants as a group have "hundreds" of beneficial owners under the ownership counting mechanisms of the 1940 Act. The Court now proceeds to an evaluation of these positions.

■ In determining the number of beneficial owners of an issuer's securities, § 3(c)(1)(A) allows the Court to "look through" a company to its constituent owners (*i.e.*, its shareholders if the "company" is a corporation, or its limited partners if the "company" is a limited partnership) if the company owns more than 10% of the

voting securities of the issuer. Upon revealing the company's constituent owners, the Court may attribute beneficial ownership by a company to the company's constituent owners.

▮ Because GPGAP is comprised of six limited partnerships, it is necessary at this juncture to determine whether a limited partnership interest may be characterized as a voting security. Section 2(a)(42) of the 1940 Act defines "Voting security" as "any security presently entitling the owner or holder thereof to vote for the election of directors." The statutory definition does not address whether a limited partnership interest may qualify as a voting security. The SEC staff, however, has interpreted such interests to be voting securities for § 3(c)(1) purposes "if a limited partner [has] has an economic interest which [gives] it the power to exercise a controlling influence over the partnership." *Horsley Keogh Venture Fund*, SEC No-Action Letter (Apr. 27, 1988) (available on WESTLAW, FSEC–NAL database) (Lexis Fedsec–Noact). *See also Devonshire Capital Corp.*, SEC No–Action Letter (Feb. 15, 1976) (available on WESTLAW, FSEC–NAL database) (Lexis Fedsec–Noact) ("[U]nder some circumstances holders of interests in limited partnerships may be regarded as having sufficient ability to exercise control through economic power over the partnerships so that the partnership interests are functionally equivalent to voting securities.); *Pierce, Lewis & Dolan*, SEC No–Action Letter (Apr. 21, 1972) (Limited partnership having "an economic interest which gave it the power to exercise a controlling influence [has] the equivalent of a voting security.").[2] The Court is amply persuaded that a limited partnership interest may be the functional equivalent of a voting security for purposes of § 3(c)(1)(A) when the limited partnership is able to exercise a controlling economic influence on

the limited partnership. Accordingly, if any of the limited partners in the limited partnership defendants which own more than 10% of the Fund's stock are capable of exercising such control, the Court may "look through" the limited partnership to its limited partners for purposes of counting beneficial owners.

The Court notes that such a construction of the § 3(c)(1) exemption is consistent with the purpose of § 12(d)(1)(A): to prevent the control of registered investment companies by other investment companies. The Court is also mindful of the 1940 Act's stricture barring "any person, directly or indirectly, to cause to be done any act or thing through or by means of any other person which it would be unlawful for such person to do" under the 1940 Act. 15 U.S.C. § 80a–47(a). This admonition has colored the actions of the SEC in construing § 12(d)(1)(A).

In *The M.A. Hanna Co.*, 42 S.E.C. 477, 481 (1964), when the M.A. Hanna Co. established a corporate shell with no stockholders, the SEC looked to substance rather than form in holding that the shell was an investment company because it was in fact controlled by Hanna. The SEC rejected the position that the shell was exempt from the 1940 Act under § 3(c)(1) because it lacked shareholders:

> [T]he interpretation advanced by applicants would provide an easy means of avoiding the restrictions of Section 12(d)(1) by the simple expedient of organizing new corporate investment vehicles. It would frustrate the purposes of that section and violate the mandate, set forth in Section 1(b) of the Act, that the provisions of the Act be interpreted so far as is feasible to eliminate the evils enumerated therein, including *inter alia*, the evils in Section 1(b)(4), to the elimina-

---

**2.** "No–Action Letters" are used by private parties who try to "pre-clear" their activities with the SEC staff. Typically, the party describes the pertinent facts to the staff and requests that the staff reply that, under the described circumstances, it will recommend that no enforcement action be taken against the party if it does what is described. The staff responds by either grant-

ing or denying the request for such a "no-action" position. In light of this practice, there is scarce case law on arcane issues such as beneficial ownership for § 3(c)(1) purposes; instead, much of the "law" in such areas is found in the informal SEC interpretations contained in the no-action letters.

tion of which Section 12(d)(1) is addressed.

*Id.*

The SEC reiterated its view that a company cannot avoid § 3(c)(1) by not issuing voting stock in denying a no action letter to a company that proposed to establish investment pools in which the participating investors would not have the right to vote:

> Moreover, were any company as defined in Section 2(a)(8) of the Act to be the beneficial owner of 10% or more of the pool's outstanding securities, the designation of such securities as non-voting would not in our view foreclose us from deeming the beneficial ownership to be that of the holders of such company's outstanding securities. This would be especially appropriate where such company's economic interest in the pool gives to it as a practical matter the equivalent of a voting interest and where but for the absence of voting rights the issuer represents a classic investment company organization, which if registered under the Act would be required to give voting rights to its security holders.

*Hudgins, Hurley Capital Management Corp.,* SEC No–Action Letter, [1972–1973 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 79,176 at 82,582 (Nov. 15, 1972).

Defendants concede that there may be circumstances necessitating a court to "look through" a company to the tier below it in order to meaningfully evaluate beneficial ownership of an issuer's outstanding securities. They maintain, however, that only the first tier should be bared. Such a limitation would render § 12(d)(1)(A) completely ineffectual against adroit assemblers of ownership structures. As the SEC pointed out in a no-action letter:

> *"[T]he attribution of beneficial ownership provided for in Section 3(c)(1) of the Act does not preclude—and in fact requires,* if the distinction between public and private ownership of investment companies is to be meaningful—*scrutiny of as many levels in the chain of ownership as necessary* to establish whether more than one hundred person have beneficial ownership."

*Devonshire Capital Corp.,* SEC No–Action Letter (Feb. 15, 1976) (available on WESTLAW FSEC–NAL database) (Lexis Fedsec-Noact) (emphasis added).

With these principles in mind, the Court turns to the six limited partnership defendants and GPGAP, "looking through" those entities where appropriate to meaningfully evaluate beneficial ownership. Even before GPGAP was formed on December 29, 1988, the six limited partnership defendants were a "company" under § 2(a)(8) of the 1940 Act because they were an "organized group of persons whether incorporated or not." Immediately before GPGAP's inception, four of the six limited partnerships owned greater than 10% of the group's Fund shares, and may be appropriately "looked through" under § 3(c)(1)(A):

| Partnership | Fund Shares | Percentage |
|---|---|---|
| Sumter | 537,800 | 48.03% |
| Drake | 145,450 | 12.99% |
| Grace–Merrill | 145,450 | 12.99% |
| Anglo–American | 29,090 | 2.60% |
| Sterling | 203,630 | 18.19% |
| Churchill | 58,180 | 5.20% |
| | 1,119,600 | 100.00% |

Delaying a searching assessment of Sumter for a moment, Grace–Merrill, Sterling, and Drake are "looked through" first. Grace–Merrill has 26 limited partners, Sterling has 29 limited partners (one of whom is Anglo–American), and Drake has 12 limited partners. At this tier, there are 67 beneficial owners under the counting mechanism of § 3(c)(1)(A):

| | |
|---|---|
| 1 | Anglo–American |
| + 1 | Churchill |
| + 1 | Sumter (assuming no "look through") |
| +28 | Sterling limited partners (without counting Anglo–American as a Sterling partner) |
| +25 | Grace–Merrill limited partners (without double-counting a Sterling limited partner) |
| +11 | Drake limited partners (without double-counting a Sterling limited partner) |
| 67 | "beneficial owners." |

An unveiling of Sumter's composition, however, clearly excludes GPGAP from the "one hundred persons" exemption.

Because Sumter owns more than 10% of the outstanding GPGAP voting securities, Sumter's beneficial ownership may be deemed to be that of the holder's of Sumter's outstanding securities. *See* 15 U.S.C. § 80a–3(c)(1)(A). Sumter was formed as a general partnership in December, 1987 with TBP Partners Ltd. ("TBP") and GLG American as its general partners. T. Boone Pickens, III, is the sole general partner of TBP, a Texas limited partnership. The only purpose to Sumter's formation was to "invest in securities of closed-end investment companies such as the [Fund]." Schedule 13D, Item 4. Thus Sumter itself is also an investment company within the meaning of § 3(a) of the 1940 Act.

GLG American was formed to invest in Sumter, *see* Excerpts from Deposition of T. Boone Pickens, III, Exh. 7 to Plaintiff's Additional Factual Submissions, and contributed 91% of Sumter's capital. GLG American is a wholly-owned subsidiary of Graker Equities Limited, an Ontario corporation, and has no other business than to own securities of companies that are not subsidiaries of its corporate grandparent, Great Lakes Group, Inc., an Ontario corporation listed on the Toronto and Montreal stock exchanges. Graker is a wholly-owned subsidiary of Great Lakes and has no business other than holding the securities of Great Lakes Group subsidiaries.

In March, 1988, Sumter was converted into a limited partnership, with TBP as its sole general partner and GLG American as its sole limited partner. As a limited partner, GLG American had the unilateral right to withdraw from the partnership. *See* Defendants' Exh. L at § 8.02(a).[3]

On December 29, 1988, GLG American committed to contribute $11 million to purchase Fund shares in the contemplated tender offer. If that contribution is made, GLG American will have contributed $21 million of Sumter's $22 million in assets.

Before GPGAP's formation, Sumter owned 48.03% of the investment group's outstanding Fund stock. Section 3(c)(1)(A) clearly requires that the holders of Sumter's outstanding securities, TBP and GLG American, be included in the computation of beneficial ownership of the securities of the organized group of persons which would become GPGAP. Plaintiff contends that the "look through" of Sumter should not end at this tier. As a general and a limited partnership, Sumter's purposes have been restricted to activities involving securities investments, making it an investment company under § 3(a)(1) of the 1940 Act. *See* Defendants' Exh.L. § 1.02; Exh. M, § 1.04. If it is determined that GLG American owns 10% or more of the outstanding voting securities of Sumter, GLG American's beneficial ownership of Sumter will be deemed to be that of the holder's of GLG American's outstanding securities. *See* 15 U.S.C. 80a–3(c)(1)(A).

■ Defendants assert that GLG American's limited partnership interest in Sumter is not a voting security because GLG American lacks the power to exercise a controlling influence over the limited partnership. This contention ignores several aspects of GLG American's status as a limited partner. Before the amendments to the limited partnership agreement, at a time when Sumter was acquiring greater than 3% of the Fund's stock, GLG American alone had the right to voluntarily withdraw from the partnership. GLG American has contributed 91% of Sumter's capital, and, if its committment to contribute $11 million to purchase Fund shares is honored, will have contributed $21 million of Sumter's $22 million in assets. GLG American has sufficient influence in Sumter to properly include the holders of its outstanding securities within the attribution rule of § 3(c)(1)(A).

---

**3.** Defendants point out that this right was surrendered in the December 29, 1988 amended partnership agreement. This fact is of no moment. Sumter and the organized group of persons which would become GPGAP both owned far more that 3% of the Fund's stock while the provision was in effect. Therefore both entities may have violated § 12(d)(1)(A) long before GPGAP was formed.

Moreover, the Court notes that in deciding whether to regard a limited partnership interest as a voting security, the SEC has considered as a dispositive factor whether the limited partner was formed for the purpose of making the investment in the limited partnership. *See e.g., Horsley Keogh Venture Fund,* SEC No–Action Letter (Apr. 27, 1988) (available on WESTLAW, FSEC–NAL database) (Lexis Fedsec–Noact); *Kohlberg Kravis & Roberts,* SEC No–Action Letter (Sept. 9, 1985) (available on WESTLAW, FSEC–NAL database) (Lexis Fedsec–Noact). There is little doubt here that GLG American was formed to invest in Sumter. *See* Excerpts from the Deposition of T. Boone Pickens, III, Exh. 7 to Plaintiff's Additional Factual Submissions.

Defendants note that GLG American was initially a general partner in Sumter. They argue that the above rule penalizes GLG American for becoming a limited partner at a later time. This position is groundless. In fact, GLG American stood a lesser chance of being looked through as a limited partner. *See Pierre, Lewis & Dolan,* SEC No–Action Letter (Apr. 21, 1972) (SEC "would ordinarily regard a general partnership interest as the equivalent of a voting security having substantially more than 10% of the voting power for purposes of Section 3(c)(1)."). It is fairly evident that Sumter was aware of this rule when it transformed into a limited partnership.

■ As noted above in the *Devonshire* no-action letter, § 3(c)(1) requires "scrutiny of as many levels in the chain of ownership as necessary to establish whether more than one hundred persons have beneficial ownership." *Devonshire, supra.* It cannot be seriously urged that GLG American should not be "looked through" to the level of Great Lakes, GLG American's corporate grandparent. As noted above, Graker Equities Limited owns 100% of GLG American. In turn, Great Lakes owns 100% of Graker. Great Lakes is listed on the Toronto and Montreal Stock exchanges. To be so listed, Great Lakes must have at least 200 shareholders. *See* 5 Canadian Sec.L.Rep. (CCH) ¶¶ 770–011, 815–051–851–

053. The conclusion is inescapable that Sumter alone has more than 100 beneficial owners. Under the aegis of Sumter, a series of closely affiliated investment vehicles comprise a coordinated unit which, as a group of organized persons, own nearly 50% of the group's Fund stock. To ignore this reality would be to wink at artfully constructed investment companies and ignore the antipyramiding provisions of the 1940 Act. *See Bancroft Convertible Fund, Inc. v. Zico Investment Holdings Inc.,* 825 F.2d 731, 738 (3d Cir.1987) (quoting district court opinion).

### The GPGAP Allocation

■ The allocation of Fund shares in GPGAP, created on December 29, 1988, (*i.e.,* the allocation of Fund shares directly. or to be owned through GPGAP) is as follows:

| | |
|---|---|
| Sumter | 46% |
| Drake | 4% |
| Grace–Merrill | 4% |
| Anglo–American | 20% |
| Sterling | 18% |
| Churchill | 8% |

*See* GPGAP General Partnership Agreement Schedule A (annexed as Exhibit 11 to the Schedule 14D–1).

This shifting of ownership interests does not affect the Court's analysis of beneficial ownership. First, as demonstrated above, Sumter alone was an issuer with more than 100 beneficial owners before and after GPGAP's formation and is an investment company. Second, even if the December 29, 1988 allocation results in fewer than 100 beneficial owners of GPGAP upon completion of the tender offer, the fact remains that before the formation of GPGAP, and today, the defendants were and are an investment company and their current ownership of Fund shares violates § 12(d)(1)(A).

■ Defendants correctly observe that if Sumter did not exist and GLG American owned an equity interest in the Fund equivalent to Sumter's, GLG American would be exempt from the registration provisions of the 1940 Act pursuant to § 3(b)(1) and (3) of the Act. These provisions exclude from the definition of an investment company:

(1) Any issuer primarily engaged, directly or through a wholly-owned subsidiary or subsidiaries in a business or businesses other than that of investing, reinvesting, owning, holding or trading in securities.

(3) Any issuer all the outstanding securities of which ... are directly or indirectly owned by a company excepted from the definition of an investment company by paragraph (1) ... of this subsection.

15 U.S.C. § 80a–3(b)(1) and (3).

The argument under subsection 1 is essentially the flip side of the prohibition found in § 48(a) of the 1940 Act against accomplishing indirectly what may not be accomplished directly. Defendants ask this Court not to prevent GLG from doing indirectly what it could do directly. The contention is interesting, but it ignores the existence of Sumter and GPGAP, entities whose primary purpose is investing in securities. The argument under subsection 3 fails because not all of Sumter's outstanding securities are owned by GLG American. A plain reading of the statute dictates this result.

Plaintiff takes the position that even without "looking through" Sumter, GPGAP has more than 100 beneficial owners because one of Drake's limited partners, Kimco Development Corporation, owned more than a 10% interest in Drake as of December 14, 1988 and should be "looked through" to its 49 holders of common stock. The Court declines to rule on that issue at this time because the record discloses insufficient information regarding Kimco's interest in Drake to enable the Court to evaluate the Drake–Kimco relationship.

### Preliminary Injunction

In this Circuit, a party seeking preliminary injunctive relief must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P.*

*Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979); *Minstar Acquiring Corp. v. AMF Inc.*, 621 F.Supp. 1252, 1257 (S.D.N.Y.1985).

### Irreparable Harm

If injunctive relief is not granted, plaintiff is virtually certain to sustain irreparable harm. As disclosed in their offer, GPGAP intends to replace the present investment advisor to the Fund and may, by a shareholder vote GPGAP would control, radically alter the Fund's investment objectives and policies. If the SEC later finds GPGAP to have been an unregistered investment company, it is likely defendants will be barred from investment company management, and no court will be able to restore the Fund to pre-tender offer circumstances. *See Sonesta Int'l Hotels Corp. v. Wellington Assoc's*, 483 F.2d 247, 250 (2d Cir.1973); *Pabst Brewing Co. v. Kalmanovitz*, 551 F.Supp. 882, 895 (D.Del. 1982).

In *Bancroft Convertible Fund, supra,* the Third Circuit Court of Appeals affirmed the district court's finding of imminent irreparable harm in a tender offer by an allegedly unregistered investment company in violation of § 12(d)(1)(A). The *Bancroft* Court stated:

"[I]f control [by the bidder] brings with it irreversible adverse consequences, that does become the concern of the Court. Here it has been established that Bancroft has maintained an investment policy which presumably its shareholders wish to pursue or else they wouldn't have purchased or retained their shares. Some of those who wish to continue to pursue such investment goals no doubt tendered their stock to [the bidder] fearful that [the bidder] might change those policies. They can take their money and seek investments similar to their investments in Bancroft elsewhere. Other Bancroft shareholders probably hope present management and policies will continue and were persuaded by management's arguments to stay on and not let [the bidder] acquire control through the purchase of their shares. *They would be*

*injured if [the bidder] takes over and pursues its likely plan to change investment policies.*

*Once [the bidder] acquires the stock it seeks it will be difficult or impossible to return to the status quo ante."*

825 F.2d at 738–39 (quoting the district court's opinion with approval) (emphasis added).

Moreover, irreparable harm surely would visit shareholders of the Fund who would be forced to decide whether to tender their shares on the basis of apparently insufficient and even inaccurate information about GPGAP. As noted earlier, the SEC has obtained information "which tends to show" material omissions and inaccuracies in the defendants' Schedule 13D and 14D–1 statements. Such an uninformed tender of securities will not be countenanced under the Exchange Act and the 1940 Act. *See, e.g., Life Investors, Inc. v. AGO Holding, N.V.,* [1981–1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98, 356 (8th Cir. Oct. 21, 1981); *General Steel Indus., Inc. v. Walco Nat'l Corp.,* [1981–1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98, 402 (E.D.Mo. Nov. 24, 1981). *See also Riggs Nat'l Bank v. Allbritton,* 516 F.Supp. 164, 181 (D.D.C.1981) (shareholders irreparably harmed "by being compelled to make an important investment decision upon an Offer to Purchase which is incomplete and materially misleading.").

Defendants, relying on *Avnet, Inc. v. Scope Indus.,* 499 F.Supp. 1121 (S.D.N.Y. 1980), contend that irreparable harm is not present because the tender offer will be subject to rescission at the option of each selling Fund shareholder in the event that the SEC issues a ruling against defendants. *Avnet,* however, is not sufficiently on point to be controlling here.

In *Avnet,* defendant had filed a Schedule 13D after acquiring more than 5% of plaintiff's outstanding shares. After acquiring still more shares, defendant amended its Schedule 13D and stated that it would seek representation on plaintiff's board of directors. In response, plaintiff commenced a lawsuit under § 13(d) of the Exchange Act seeking an injunction "based solely on [defendant's] failure to disclose that it is an unregistered investment company and the alleged consequences of that status." *Avnet,* 499 F.Supp. at 1123 n. 2. Judge Lasker held that defendant's disclosure of plaintiff's allegation in the Schedule 13–D's second amendment was sufficient to pass muster under § 13(d) and dismissed plaintiff's disclosure claim. *See id.* at 1124–26. Judge Lasker continued, in *dicta,* that even if the claim was not dismissed, plaintiff failed to demonstrate a likelihood of success on the merits because the sales of stock at issue were "not void, but merely voidable." *Id.* at 1127.

In *Avnet,* however, the plaintiff was not an investment company and therefore § 12(d)(1)(A) was not implicated. In the instant matter, allowing the individual shareholders of the Fund to decide whether or not to rescind their sale to defendants will completely undermine the antipyramiding goals of the 1940 Act. Transactions violative of § 12(d)(1)(A) must be void, irrespective of the individual shareholder's wishes. Accordingly, this Court concludes that the Fund will incur irreparable harm if a preliminary injunction does not issue.

**B. Likelihood of Success on the Merits**

A party seeking a preliminary injunction under the first combination of factors afforded a movant in this Circuit "need only make a showing that the probability of his prevailing is better than fifty percent." *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985). The Court is satisfied that plaintiff has introduced sufficiently credible evidence tending to establish its allegations. In fact, the Court sees little avenue for escape by defendants from the conclusion that they are violating the antipyramiding provision of the 1940 Act. The Court finds that plaintiff has amply demonstrated a likelihood of success on the merits.

**C. Sufficiently Serious Questions Going to the Merits**

In the alternative to a likelihood of success on the merits, the Court recognizes that serious issues of fact exist in this case. As noted above, the limited discovery in this case has not uncovered sufficient infor-

mation concerning the Kimco–Drake relationship to permit a finding that Kimco should be subject to the attribution rule of § 3(c)(1)(A) of the 1940 Act. Nor has adequate discovery been conducted regarding the alleged violations of §§ 13(d) and 14(e) of the 1934 Act. Unless the balance of hardships tips decidedly in favor of the movant, however, the Court need not determine whether serious questions presenting a fair ground for litigation are present. *See Buffalo Courier–Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 58 (2d Cir.1979). Thus the Court presently turns to an evaluation of the hardships relevant to this matter.

### D. The Balance of Hardships

▆ To demonstrate that the balance of hardships tips in its favor, a movant must show that the harm it would suffer absent the relief sought is substantially greater than the harm its opponent would suffer if relief was granted. *See Buffalo Forge Co. v. Ampco Pittsburgh Corp.*, 638 F.2d 568, 569 (2d Cir.1981). When relevant, public interest is a factor to be considered on an application for a preliminary injunction. *See Carey v. Klutznick*, 637 F.2d 834, 839 (2d Cir.1980) (per curiam). This factor is particularly significant in cases involving alleged violations of securities laws because private actions there "perform a vital public service." *Gulf & Western Indus., Inc. v. The Great Atl. & Pacif. Tea Co., Inc.*, 476 F.2d 687, 698 (2d Cir.1973).

▆ In the instant matter, the granting of a preliminary injunction will merely delay defendants from making purchases pending resolution of the case. The individuals comprising the vanguard of the defendants' tender offer group are seasoned investors. These individuals "entered a risky business knowingly. If [they are] delayed or prevented from pursuing the tender offer [they] still [have their] money and may look for other opportunities elsewhere." *Bancroft Convertible Fund, Inc. v. Zico Investment Holdings Inc.*, 825 F.2d 731, 739 (3d Cir.1987) (quoting district court's opinion with approval). This reasoning is especially germane here, where

defendants commenced their tender offer knowing of the SEC investigation. *See* Mattingly Aff. ¶¶ 52–54.

The Fund, on the other hand, stands to have its current investment adviser replaced and its investment objectives radically altered. If defendants are able to take control of the Fund and effect these changes, and are later precluded from involvement in its management, the Fund would plainly face serious hardship. The public, of course, has an interest in enforcement of the securities laws which are "designed to protect the public interest." *Gulf & Western*, 476 F.2d at 698. In sum, as Judge Friendly once remarked, "the opportunity for doing equity is … considerably better … than it will be later on." *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 947 (2d Cir. 1969).

### CONCLUSION

For the reasons set forth above, plaintiff has demonstrated irreparable harm and a likelihood of prevailing on the merits; alternatively, plaintiff has raised sufficiently serious questions going to the merits so as to make them a fair ground for litigation and the balance of hardships tips decidedly in its favor. The defendants are hereby enjoined from consummating their tender offer of February 1, 1989, and from taking any steps in furtherance of the tender offer for the shares of plaintiff pending the resolution of this lawsuit. The parties are to complete all discovery within sixty (60) days of the date of this Opinion and Order. The parties are directed to appear for a status conference on March 31, 1989 at 10:00 a.m. in Courtroom 444.

Plaintiff is directed to post a bond as required by Fed.R.Civ.P. 65(c) in the amount of $500,000 by the close of business on February 3, 1989.

SO ORDERED.