Darren PHILLIP, Fred Phillip and
Marguerite Phillip, Plaintiffs,

v.

THE NATIONAL COLLEGIATE ATH-
LETIC ASSOCIATION and Fair-
field University, Defendants.

No. 3:96CV2134 (RNC).

United States District Court,
D. Connecticut.

Jan. 27, 1997.

J. Daniel Sagarin, David A. Slossberg, Hurwitz & Sagarin, Milford, CT, for Plaintiffs.

John Burns Farley, James V. Somers, Halloran & Sage, Hartford, CT, Neil L. Johnson, John J. Kitchin, Swanson, Midgely, Gangwere, Kitchin & McLarney, LLC, Kansas City, MO, Howard T. Owens, Jr., Dan E. LaBelle, Owens, Schine, Nicola & Donahue, Trumbull, CT, for Defendants.

CHATIGNY, District Judge.

After review and over objection, the Magistrate Judge's recommended ruling that the requested injunction be granted is hereby approved and adopted for reasons stated on the record during a telephone conference with counsel on January 21, 1997.

So ordered.

*RECOMMENDED RULING ON MOTION FOR PRELIMINARY INJUNCTION*

SMITH, United States Magistrate Judge.

**I. Introduction**

College basketball is big business, and the National Collegiate Athletic Association (NCAA) is the bureaucracy that oversees it. In fact, with over 1,000 member institutions, the NCAA is the law when it comes to all college athletics; and it is clear from this case that the authoritative force with which it sweeps can be broad and punishing.

If, for well-heeled private universities, dealing with the NCAA is burdensome, for inner-city guidance counselors and high school students it is surely overwhelming; and few know the truth of the foregoing better than Darren Phillip and his parents, the plaintiffs in this case.

Darren is 18 years old. He is African-American, the son of working parents from Brooklyn, New York, and, by all accounts, a talented basketball player who was heavily recruited throughout his senior year of high school. Like so many others before him, he sought to parlay his athletic skills into what would otherwise be a financially unattainable, first-rate, private university education. He was offered and accepted a full athletic scholarship to Fairfield University. However,

late in his senior year of high school, he was declared ineligible by the NCAA Initial–Eligibility Clearinghouse (Clearinghouse), an agent of the NCAA charged with determining the eligibility of incoming college freshman athletes to participate in collegiate athletics and receive scholarship aid. The Clearinghouse determined that several of Darren's high school math classes were entitled to only .33 credits, thus rendering him short of the NCAA's core-curriculum requirement.

The Clearinghouse's decision and authority to assign .33 credits to the math classes in question is at the heart of this dispute, because the principal of Darren's high school, the New York City Board of Education and the New York State Board of Education value the courses at .5 credits; and if the classes are valued at .5 credits, Darren has met the core-curriculum requirement.

The defendants in this case are the NCAA and Fairfield University. The NCAA is an unincorporated association consisting of roughly 1,000 member universities. It adopts and enforces rules governing recruitment, admissions, academic eligibility and financial aid for student athletes. Fairfield University is named as a defendant to ensure "the availability and enforceability of all injunctive remedies."

Darren is presently attending Fairfield University. However, the university, as a participating member of the NCAA, cannot provide him with an athletic scholarship until and unless he receives eligibility certification. Darren's parents have invaded their 401K plan to foot the bill for his first semester. Thanks to a temporary restraining order issued by Judge Chatigny, Darren has been practicing with the basketball team. The TRO expires on November 23, 1996, the date of Fairfield's first scheduled game, and the plaintiffs now seek a preliminary injunction that would enable Darren to receive his athletic scholarship and play basketball at Fairfield University while his case on the merits proceeds.

**II. Standard for Granting a Preliminary Injunction**

The moving party has the burden of showing, irreparable harm and either a.) a likeli-

hood of success on the merits *or* b.) sufficiently serious questions going to the merits to make them fair grounds for litigation *and* a balance of hardships tilting decidedly towards the plaintiff. *Jayaraj v. Scappini*, 66 F.3d 36 (2d Cir.1995).

In ruling on an application for a preliminary injunction or temporary restraining order, the courts have taken into account the following four most important factors: (1) the significance of the threat of irreparable harm to the plaintiff if the injunction is not granted; (2) the state of the balance between the aforementioned harm and the harm that granting the injunction would inflict on the opposing party; (3) the probability that the plaintiff will succeed on the merits; and (4) the public interest. 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2948 (1969 & Supp.1986).

The court of appeals for the Second Circuit has recognized that the standard spelled out above applies to both temporary restraining orders and preliminary injunctions. *Joseph Scott Co. v. Scott Swimming Pools, Inc.*, 764 F.2d 62, 66 (2d Cir.1985) (citations omitted). *See also Towers Financial Corp. v. Dun & Bradstreet, Inc.*, 803 F.Supp. 820, 822 (S.D.N.Y.1992). The Second Circuit has also recognized that to establish "irreparable" injury, the movant must demonstrate an "actual and imminent" injury that requires a "remedy of more than mere money damages." *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir.1989). The denial of a person's right to obtain a scholarship constitutes irreparable injury. *See Manuel v. Oklahoma City University*, 833 P.2d 288 (Okla.Ct.App.1992).

In order to establish a likelihood of success on the merits, the movant must "make a showing that the probability of . . . prevailing is better than fifty percent." *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir.1985); *Clemente Global Growth Fund, Inc. v. Pickens*, 705 F.Supp. 958, 970 (S.D.N.Y.1989).

In the event the party seeking injunctive relief cannot establish a likelihood of success on the merits, the movant may, in the alternative, satisfy the requirements for injunctive relief by demonstrating sufficiently serious questions going to the merits to make

them a fair ground for litigation and a balance tipping decidedly toward the party requesting injunctive relief. The court first inquires into whether the balance of hardships tips in favor of the movant. *Buffalo Forge Co. v. Ampco–Pittsburgh Corp.*, 638 F.2d 568, 569 (2d Cir.1981). The movant must demonstrate that the harm it would suffer if the court denied its motion is sufficiently greater than the harm its opponent would suffer if the court granted the motion. *See Clemente*, 705 F.Supp. at 971.

### III. Discussion

#### A. Background

In September of 1995, Darren Phillip was a senior at South Shore High School (SSHS) in Brooklyn, New York. He was contacted daily by college recruiters and coaches eager to commit him to an athletic scholarship; and it was around this time that he learned of the NCAA Initial–Eligibility Clearinghouse and the NCAA requirements prospective college freshman athletes must meet to be eligible for athletic scholarships and participation in college sports.

In October of 1995, Darren registered with the NCAA Clearinghouse by filling out the appropriate forms and paying the required $18 fee. And he consulted his guidance counselor, as the Clearinghouse directed him to do, to ensure the courses he had already completed, and those in which he planned to enroll, satisfied the NCAA requirements. *See Making Sure You Are Eligible to Participate in College Sports*, Plaintiff's Exhibit 2 at 6.

Initial-eligibility requirements include a combined Scholastic Aptitude Test (SAT) score in excess of 820, 13 credits of core high school courses in English, math, social sciences, physical sciences and other approved subjects, and a minimum grade point average determined on a sliding scale in accordance with the student's SAT scores.

The Initial–Eligibility Clearinghouse is an agent of the NCAA, charged with determining the eligibility of prospective college freshman athletes. *See Rich–Taubman Assoc. v. Commissioner of Revenue Services*, 236 Conn. 613, 619, 674 A.2d 805 (1996). The

high school of an athlete being recruited must fill out and submit to the Clearinghouse a 48–H form which sets forth core courses offered at the school. This form is kept on file at the Clearinghouse, and when a recruit from that high school applies for eligibility certification, the Clearinghouse checks his or her transcript against the core courses listed on the high school's 48–H form to determine whether he or she has met the NCAA core course requirements.

The Clearinghouse notified Darren on November 21, 1995 that his transcript and SSHS's 48–H form were on file at the Clearinghouse, but that it had not yet received his SAT scores and therefore could not render a certification decision as to his initial eligibility. The testimony of Calvin Symons, Director of the Initial–Eligibility Clearinghouse, revealed that the Clearinghouse does not render decisions about the initial eligibility of a prospective student athletes until it has been provided with all the necessary documentation, i.e., SAT scores, a high school transcript and a 48–H form from the student's high school.[1] If, when rendered, the decision is unfavorable—if the Clearinghouse refuses to certify an athlete to receive an athletic scholarship and participate in collegiate sports during his or her freshman year— the college or university recruiting the athlete (*not* the athlete) may appeal the ruling.

On September 5, 1996 Fairfield University took such an appeal to the NCAA Council Subcommittee for Initial–Eligibility Waivers. Ms. Stacey Herman is an NCAA legislative assistant assigned to the subcommittee. She testified that the subcommittee has authority to grant an initial-eligibility waiver when the Clearinghouse has misapplied NCAA by-laws, interpretations or precedent,[2] or if the Clearinghouse has made, in effect, a clerical error. For example, if the Clearinghouse simply added wrong when calculating Darren's core course totals, the subcommittee would have the authority to grant a waiver.

However, Ms. Herman's testimony also made clear that the subcommittee *does not* have the authority to review Clearinghouse decisions about the content and valuation of high school core courses. Appeals dealing with the content or valuation of core courses may be taken by a student's high school (not the student) to the NCAA Academic Requirements Committee.

However, the Clearinghouse never informed SSHS that such an appeal route existed; nor did it inform Fairfield University that the NCAA Council Subcommittee for Initial–Eligibility Waivers would not engage in review of clearinghouse decisions about the content and/or valuation of core courses.

Thus, by September 23, 1996, Darren's fate had been all but sealed. On that date that Ms. Jennifer Heppel, another legislative assistant assigned to the subcommittee, denied Darren's appeal. On November 12, 1996, the subcommittee reviewed and affirmed her decision, and drove the final nail into Darren's eligibility coffin.

## B. Core Courses

There is some dispute, to say the least, about who determines which high school courses are in fact core courses, and how much credit each is worth. Every year, the NCAA publishes a booklet entitled: *The NCAA Guide for the College–Bound Student Athlete.* Plaintiffs submitted into evidence the 1994–95, 1995–96 and 1996–97 versions of this publication. Plaintiffs' Exhibits 17, 18 and 19 respectively. Each version contains a question and answer section that addresses issues commonly raised by student athletes. Two questions, and their answers, are of particular relevance in this case.

The first important question, and its answer, are identical in all three versions of the booklet. The question reads: "How are courses taken over two years counted?" The

1. When question by plaintiffs' counsel about why the Clearinghouse did not perform the evaluation service for which plaintiffs paid in a meaningful, timely and effective manner by informing Darren in October or soon thereafter that, based upon his transcripts, he would need to take additional core courses in his final semester of high school,

Director Symons offered only that it is not the policy of the Clearinghouse to do so.

2. Interpretations are opinions rendered by counsel for the NCAA; precedent is the body of such opinions that have received formal approval from the NCAA.

answer: "A one-year course that is spread over two years (e.g., elementary algebra) is considered as one course." Testimony revealed that this is known as the "paced-course rule."

The other important question is also identical in all three versions of the booklet; its answer, however, is not. The question reads: "How are core courses determined?" In the 1994–95 booklet, the answer reads: "The principal of the high school you graduated from decides whether a course qualifies as a core course (NCAA members are responsible for verifying that the information from your high school is valid)." In the 1995–96 booklet, the answer is: "The principal of the high school you graduated from decides whether a course qualifies as a core course (the NCAA initial-Eligibility Clearinghouse is responsible for verifying that the information from your high school is valid)." Finally, in the 1996–97 booklet, the answer is: "The NCAA Initial-Eligibility Clearinghouse determines whether a course qualifies as a core course after receiving information provided by your high school principal."

■ Based upon the evidence produced at the hearing, the court finds that the rule in the 1996–97 booklet cannot be applied to Darren. He was a high school senior during the 1995–96 academic year, and he and his guidance counselor relied upon the rule set forth in the 1995–96 booklet to determine whether courses he had already taken, and those in which he planned to enroll in his final semester, would satisfy the NCAA core course requirements.

This finding does not, however, dispose of the issue, for the NCAA argues that even if Darren's math classes were core courses, they were subject to the paced-course rule and entitled to only .33 credits. At this juncture, a brief, but acronym-laden, review of math classes offered as SSHS is in order.

## C. Math Classes at SSHS

Math at SSHS is taught on two tracks: a two-semester track and a three-semester track. The two-semester track includes Sequential Math 1, term one and term two (SM1–T1 and SM1–T2) and Sequential Math 2, term one and term two (SM2–T1 and SM2–T2). So, for example, a freshman student at SSHS on the two-semester track might take SM1–T1 in the fall and SM1–T2 in the spring. As a sophomore, that student would take SM2–T1 in the fall and SM2–T2 in the spring.

The three-semester track includes Sequential Math 1A, 1B, and 1C (SM1A, SM1B and SM1C) and Sequential Math 2A, 2B and 2C (SM2A, SM2B and SM2C). A freshman student on this track, hypothetically, might take SM1A in the fall and SM1B in the spring. As a sophomore, the student would take SM1C in the fall and begin with SM2A in the spring, and so forth. Darren jumped tracks on more than one occasion, thus complicating the otherwise ministerial task of evaluating his core-course credits.[3]

## D. Analysis

The Clearinghouse maintains that as early as August 23, 1995, SSHS was on notice that the Clearinghouse would, at best, only value math classes taught on the three-semester track (i.e., SM1A, SM1B, SM1C, and SM2A, SM2B, SM2C) at .33 credits.[4] Plaintiffs' Ex-

---

3. Darren took and passed the following math classes: SM1–T1, SM1B, SM1C, SM2A, SM2–T1, SM2–T2. Plaintiffs' Exhibit 11.

4. The Clearinghouse also maintains that 1.) the second page of the August 23, 1995 communication made clear that the three-semester-track courses would not be recognized *at all* as core courses until additional information was provided to the Clearinghouse, and 2.) even assuming that the Clearinghouse intended the courses to be core courses valued at .33 credits, because SSHS did not appeal the Clearinghouse's stated intent to so value them, SSHS concurred and/or con-

sented. The court finds that the Clearinghouse, on August 23, 1995, intended to recognize the three-semester-track math classes as core courses valued at .33 credits. There are two reasons for this conclusion. First, these courses are plainly listed as core course valued at .33 credits on the first page of the August 23, 1995 communication. Second, and more important, for reasons expounded upon *infra* at 556–557, the Clearinghouse lacked authority to overrule core-course determinations made by the principal at SSHS in 1995. Accordingly the court also finds that SSHS did not concur and/or consent by its inaction to the .33 valuation.

hibit 21. In the Clearinghouse's view, these courses were one-year courses spread over two academic years, and were, therefore, under the paced-course rule, entitled to no more credit than that allotted to a comparable one-year course.[5] In other words, a SSHS student who completes Sequential Math 1 in two semesters (SM1–T1 and SM1–T2) receives .5 core credits per semester for a total of one core credit. The Clearinghouse applied the paced-course rule, maintaining that it would be inequitable to give a student who, in effect, required three semesters (SM1A, SM1B and SM1C) of instruction to complete the equivalent of Sequential Math 1 more credit—i.e., .5 credits per semester for a total of 1.5 core credits.

■ In the court's view, the Clearinghouse's application of the paced-course rule in this case is fatally flawed, for it assumes that the math courses offered on the three-semester track are identical to the courses offered on the two-semester track. The court does not find this to be so, and this finding is supported by the deposition of Steven Berger, the current principal of SSHS. Plaintiffs' Exhibit 26. Principal Berger testified that although courses on the two-semester track and the three-semester track encompass the same general topics, they are different courses, taught in different ways, covering different material, with the three-semester-track courses covering material in more depth. *Id.* at 60–61, 76. For these reasons, his predecessor, Principal Rita Stemple, designated the three-semester-track math courses as core courses, as she, and only she, was authorized to do. *See 1995–96 NCAA Guide for College–Bound Athletes,* Plaintiffs' Exhibit 18 at 4. The three-semester-track core courses were not, and are not, by Principal Berger's own sworn testimony, merely the twins of the two-se-

mester-track math courses—i.e., "one-year course[s] spread over two years"—and they should not have been devalued by application of the paced-course rule.

■ The *1995–96 NCAA Guide for College–Bound Athletes* expressly states that "[t]he principal of the high school ... decides whether a course qualifies as a core course...." *Id.* It gives the Clearinghouse authority to "verify that information from [the] high school is valid." *Id.* It does not, however, empower the Clearinghouse to, in effect, overrule high school principals' core-course designations; and this court will not adopt an expansive interpretation of the language the NCAA itself chose to employ, especially since testimony revealed that neither Director Symons nor, to his knowledge, anyone on his staff at the Clearinghouse is, or ever was, a school principal or a teacher or had experience in designing course curriculums.[6]

In the *1996–97 NCAA Guide for College–Bound Athletes,* the Clearinghouse expressly claimed for itself authority to determine which courses qualify as core courses. Heretofore it may rightfully flex this muscle, but it may not do so retroactively to pin Darren Phillip.

## IV. Conclusion

Darren Phillip testified at the preliminary injunction hearing, and his testimony was persuasive. On the stand, he was poised, mature and credible, but genuinely frustrated by his predicament. He feels, perhaps justifiably so, that he has done all one could be expected to do to meet the eligibility requirements. He registered with the Clearinghouse, consulted his guidance counselors to verify that courses he completed satisfied NCAA core-course requirements, and achieved a sufficiently high grade point aver-

---

5. The process of crediting and valuating core courses is further complicated by the fact that no credit is given for completion of a course that includes the same general topics as another core course completed by the student. And Darren was given no credit by the Clearinghouse for completing SM2A because he later completed SM2–T1.

6. Mr. Symons also testified that he, as director of the Clearinghouse, had no reason to hold suspect

the purpose behind Principal Stemple's core-course designations or the veracity of her intent in assigning .5 credits to the three-semester-track math courses. The court's finding is strengthened by this testimony and by the fact that the New York City Board of Education and the New York State Board of Education concur in Principal Stemple's conclusion that the courses should be, and for purposes of graduation requirements are, valued at .5 credits.

age. When he had questions about his eligibility, he called the Clearinghouse, only to be frustrated by recorded messages that were not helpful. When his initial SAT scores were low, he committed himself to hard work. His parents, eager no doubt to see their son succeed, spent approximately $500 for a private tutor; and after several attempts, Darren's best combined SAT score was 940, well above the NCAA's minimum required score.

Like all college freshman, Darren is beginning a new life, making new friends and acclimating himself to new surroundings that, by his own account, are very different from those to which he is accustomed. One can but imagine how his anxiety has been multiplied by the predicament into which he has been thrust and the threat of having his life unraveled by the officious stroke of a pen.

█ It is clear to the court that Darren will suffer irreparable harm if the motion for a preliminary injunction is denied. His mother testified that without a full athletic scholarship, it will be financially impossible for Darren to remain at Fairfield University. Thus, if the motion is denied, Darren's education will be interrupted and delayed, perhaps for years. Moreover, while it is quite possible that plaintiffs have demonstrated a likelihood of success on the merits of their estoppel claim, it is plain beyond debate that the balance of hardships tips in favor of the plaintiffs and equally plain that there are sufficiently serious questions going to the merits to make them fair grounds for litigation.

The Clearinghouse's goal of ensuring the preparedness of high school students to meet the academic rigors of college is laudable, as is its effort to establish uniform interpretation and enforcement of academic requirements. However, in applying the paced-course rule in Darren's case, the Clearinghouse stepped out of bounds.

The preliminary injunction plaintiffs seek is an equitable remedy. Based upon the testimony adduced at the hearing, and evidence presented, the court finds that there would be no equity in denying Darren Phillip his athletic scholarship, participation in the sport of his choice and, as a result, access to an education at Fairfield University. Plaintiffs motion for a preliminary injunction should be **GRANTED**, with the NCAA, its agents, servants, employees and all persons acting in concert with it, being enjoined from:

(a) interfering or otherwise preventing, directly or indirectly, plaintiff Darren Phillip from playing, practicing and/or competing with the Fairfield University basketball program; and

(b) interfering, directly or indirectly, with Darren Phillip's ability to receive financial and scholarship aid.

The defendant Fairfield University, its agents, servants, employees and those acting in concert with it should be enjoined from denying Darren Phillip the benefits of the grant-in-aid offered him on April 24, 1996, and from denying Darren Phillip entitlement to participate fully in Fairfield University's basketball program. The court, having considered the issue of bond, determines that the providing of one is not warranted in this case.

It is so ordered this 22nd day of November, 1996 at Hartford, Connecticut.